RAYTHEON MANUFACTURING COMPANY & another *vs.* RADIO CORPORATION OF AMERICA.

Suffolk.    April 6, 1933. — March 28, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, & DONAHUE, JJ.

*Contract,* Construction, Performance and breach, License to manufacture and sell patented article.    *Evidence,* Extrinsic affecting writing.  *Interest.  Equity Jurisdiction,* Accounting, Laches.  *Words,* "Royalty."

Where a license given by the holder of a patent to manufacture and sell the patented article at a royalty of ten per cent provided that, if the licensor "shall in the future grant another . . . [similar] license . . . at a . . . [lower] rate of royalty . . . for future manufacture and sale," the first licensee "shall thereafter have the benefit of such lower rate of royalty" on certain conditions, and thereafter the licensor did give to another a similar license at a lower rate of royalty, the mere circumstance, that in granting the second license the licensor did not exact from the second licensee any payment for his having manufactured the patented article during a certain period previous to the granting of the second license, did not entitle the first licensee to a "zero rate" of royalty for that period: the giving to a new licensee of a mere release of damages for infringement already accrued did not fall within the scope of the provision above quoted, which was applicable only to the giving to a new licensee of an express license for future manufacture and sale.

A license given by the holder of a patent to manufacture and sell the patented article at a royalty of ten per cent provided that if the licensor should thereafter grant similar licenses at a lower rate of royalty, the first licensee should "thereafter have the benefit of" the lower rate, provided he "accepts all the other conditions and obligations imposed on" the other licensees by their licenses and "makes equal contributions to the" licensor.    In a September thereafter, the licensor meanwhile having granted other licenses, the licensor offered to all the then licensees, including the first licensee, a reduction of the rate of royalty to five per cent, retroactive for about two years and conditioned upon the giving of general releases by the licensees to the licensor.    At the same time the licensor paid to others a substantial amount in settlement of their claims against him for violation of the Federal antitrust laws, took general releases from them, and granted them new licenses at a five per cent rate of royalty.  The licensor's offer was accepted by some of those who already had licenses in September, but was rejected by the first licensee because of an interest which he asserted he had in a claim under such laws pending against the licensor.    The first licensee later tendered a general

release subject to the condition that it should not affect such pending claim. It did not appear that the first licensee had a valid or valuable interest in that claim or that those who already had licenses in September and who accepted the licensor's offer did not have valuable claims against the licensor which they gave up by reason of the releases executed by them in accordance with the offer. In a suit in equity by the first licensee against the licensor, the plaintiff contended that he had tendered to the defendant a sufficient release in compliance with the defendant's offer and that in any event he was entitled to the five per cent rate of royalty beginning two years previous to September, without giving the defendant a general release. *Held,* that

(1) The requirement made by the defendant as part of his offer of September, that the then licensees give him general releases, was within the meaning of the phrase "conditions and obligations" in the plaintiff's license;

(2) The conditional release tendered by the plaintiff was not a general release such as the others who had licenses in September had executed, and by giving such conditional release the plaintiff would not have accepted "all the other conditions and obligations imposed on" such other licensees;

(3) The facts did not support a contention by the plaintiff that the requirement, that he give a general release in order to obtain the five per cent rate of royalty for the period of two years up to September, imposed on him greater "conditions and obligations" than were imposed on the others who already had licenses in September, in that the other then licensees had no claims to give up by executing general releases and he was the only one who had a meritorious claim so to give up;

(4) Those who were given licenses for the first time in September stood on a different footing from the plaintiff and others who already had licenses at that time; and the circumstances, that the new licensees were paid a substantial sum for their releases and that the defendant did not propose to pay the plaintiff in like manner, did not show that the defendant sought to exact an unequal contribution from the plaintiff with respect to the lower rate of royalty for such period of two years;

(5) The plaintiff, not having given a general release and therefore not having accepted the same "conditions and obligations" as did the others who already had licenses in September, was not entitled to the lower rate of royalty for such period of two years;

(6) The plaintiff was entitled to the lower rate of royalty after September without having given a general release: the defendant having paid to those, who then received new licenses for the future at the lower rate, a substantial sum for the releases which they executed in connection with the settlement of their claims, an unequal contribution would be exacted from the plaintiff if, in order to obtain the lower rate for the future, he were required to give a general release without any settlement of the claim in which he asserted an interest;

(7) The circumstances, that the manner in which the total sum

paid by the defendant was distributed among the new licensees did not appear and that it was not shown that the plaintiff had a valid and valuable interest in such claim against the defendant, were immaterial on the question of the plaintiff's right to the lower rate of royalty after September without having given a general release.

It *was stated* that it is only in instances where the terms of a contract are ambiguous that the conduct of the parties after its making may be considered in construing it.

Under a license given by the holder of a patent to manufacture and sell the patented article at a certain rate of royalty, the licensor was entitled to interest on royalties, not paid when due, from the due dates to the times of payment.

In a suit in equity involving an accounting, the defendant contended that payments to him from the plaintiff should have been on a basis which would have made them somewhat larger, and it appeared that such was the correct basis, but it was *held*, in the circumstances, that, although the question of laches of the defendant was not raised in the pleadings, the computation of sums due on that basis properly was made retroactive only to the time of the commencement of the suit, it further appearing that for a substantial period previous to that time the defendant, knowing the facts, had accepted payments on a different basis and that the defendant made such contention for the first time when he filed a cross bill in the suit.

Where the holder of a patent gave a license to manufacture and sell the patented article to one who sold all the articles so manufactured to a corporation, the license providing that the basis for the payment of royalties should be the invoice price of the articles sold, with a provision concerning resale by one standing in the relation to the licensee which the corporation had, the licensor in the circumstances was not entitled to royalties on articles held in inventory by the corporation, it appearing, among other things, that the license made no reference to the payment of royalties on articles held in inventory.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on December 14, 1931, and afterwards amended, by Raytheon Manufacturing Company and Raytheon Production Corporation.

The suit was referred to a master. The amended bill and material facts found by the master are described in the opinion. By order of *Field*, J., there were entered an interlocutory decree overruling the plaintiffs' exceptions to the master's report and sustaining an exception by the defendant thereto and otherwise confirming the report; and a final decree as described in the opinion. The plaintiffs appealed from both decrees. The defendant appealed from the final decree.

*E. F. McClennen*, for the plaintiffs.

*R. C. Curtis*, for the defendant.

RUGG, C.J.   This suit was brought to adjust differences between the parties (all corporations organized under the laws of Delaware with places of business in this Commonwealth) arising out of a license agreement and an accompanying agreement, both dated March 19, 1929, as to the manufacture of radio tubes.   In general the purpose of the suit is to enforce the terms of art. Three, § 7, of the license agreement made by the defendant, and to determine the amount of royalties due to the defendant under the license agreement.   A cross bill was filed by the defendant.   The case was referred to a master to hear the parties and their evidence and to find the facts.   No evidence is reported.   The findings of fact, therefore, must be accepted as true.   The facts thus displayed in substance are these: On March 19, 1929, the defendant gave a license under patents to the plaintiff Raytheon Manufacturing Company.   On April 20, 1929, the Raytheon Manufacturing Company assigned the license to the Raytheon Production Corporation and the defendant assented to the assignment.   The word plaintiff wherever used hereafter will refer to the Raytheon Production Corporation.   The license was to manufacture and sell radio tubes at a royalty of ten per cent under the patents.   By § 7 of art. Three of the license agreement it was provided as follows: if the licensors "shall in the future grant another license for the same purposes and for the same territory as provided herein, at a rate of royalty less than ten per cent. (10%) for future manufacture and sale, then the Licensee shall thereafter have the benefit of such lower rate of royalty, provided that the Licensee at the same time accepts all the other conditions and obligations imposed on the Licensee by such other license, and by any agreement referred to therein with any of the Licensors, and makes equal contributions to the Licensors.   The Radio Corporation shall notify the Licensee upon the granting of such other license."   The license agreement also contained a general release running from the licensee to the defendant and its colicensors.   The contemporaneous

accompanying agreement provided in paragraph (3) that "notwithstanding the general releases to the Licensors contained herein and in Section 2 of Article Six of the said agreement, if, hereafter any claimant for damages alleged to have arisen in the operation of a certain clause designated '9' in certain license agreements and 'g' in certain other license agreements heretofore made by the Licensors with manufacturers of radio receiving apparatus . . . becoming licensed under all or a substantial part of the patents under which a license is granted by said agreement, shall obtain a pecuniary recognition of its claim in consequence of judgment, or agreement of settlement, or otherwise, then the Licensee shall become entitled to assert its claim for such damages and none of the Licensors shall be entitled to plead said releases in bar thereof . . . ." Subsequently to the execution of this license agreement with the plaintiffs, the defendant in August, 1929, issued similar licenses to other corporations at a royalty rate of seven and one half per cent, but no accompanying agreement was made with the licensees similar to that made with the plaintiffs. Those companies had had no licenses from the defendant prior to August, 1929. When the plaintiffs learned of these facts, a reduction was sought in the rate to seven and one half per cent, and an effort was made to have that rate apply retroactively to the original date of the license agreement. The defendant declined to accede to this and demanded as a condition of the reduction of the rate to this figure that the plaintiffs execute a general release similar to that executed by the other companies upon receiving the seven and one half per cent rate. The plaintiffs made payment on the basis of their own contention but continued to refuse to sign the general release because of the agreement which they had made of even date with the original license agreement. The defendant accepted the "payment of royalty on the basis of $7\frac{1}{2}\%$ from the date of the license . . . with the understanding that the licensors reserve the right to apply the difference between royalty at $10\%$ and royalty at $7\frac{1}{2}\%$ upon sales made by the Raytheon Company toward the possible settlement of any claims which the Raytheon

Company may hereafter make against the licensors . . . ."
On November 1, 1929, the defendant and its colicensors
issued licenses to a so called lamp license group of companies
at a royalty of seven and one half per cent, but with no
accompanying agreement similar to that made with the
plaintiffs. The plaintiffs did not know of this till some time
in the spring of 1930, at which time they claimed a rebate
under the license agreement of all royalties prior to No-
vember 1, 1929, because the five companies comprising the
lamp license group had received licenses with royalties
starting from November 1, 1929. In the fall of 1930 the
rebate claimed as to royalties paid prior to November 1,
1929, was finally granted to the plaintiffs and other licensees.
The following year a conference was held between the vari-
ous tube licensees and the defendant. As a result of this,
on September 1, 1931, the defendant sent to all existing
radio tube licensees identical proposals for the modification
of their existing license agreements. This incorporated a
reduction in royalty rate from seven and one half per cent
to five per cent, and credits in excess of the latter rate back
to November 1, 1929, and was conditioned upon the execu-
tion of a general release. The plaintiffs refused to accept
this condition though it was accepted by certain other
companies. At the same time the defendant made a settle-
ment with sixteen other companies that had brought suit
against it charging violation of the antitrust laws. The
settlement involved releases by the defendant of all claims
for past infringements of patents, releases by the sixteen
companies of all claims against the defendant, the payment
of $1,635,000 to counsel for these companies, and the
granting of licenses to such of them as were actively engaged
in the manufacture of radio tubes at a five per cent rate of
royalty. Meanwhile the Raytheon Production Corporation
(as claimed by the defendant) had failed to send the required
statement of tube sales, as provided in the original license
agreement, for July 15, 1931, and October 15, 1931. Ac-
cordingly, on November 27, 1931, the defendant sent the
Raytheon Manufacturing Company notice of this default.
The license agreement provided in art. Eight, § 2, that if

the licensee was in default the defendant might terminate the license upon thirty days' written notice. On December 14, 1931, the Raytheon Manufacturing Company, a precedent Massachusetts corporation which had changed its name to Raytheon Inc., brought suit in the United States District Court for Massachusetts for the benefit of Raytheon Manufacturing Company, to recover from the Radio Corporation of America (defendant in the present suit) damages for acts in violation of the antitrust laws of the United States. On the same day the present bill of complaint was filed.

The prayers of the plaintiffs as set forth in their bill as amended are that the defendant be temporarily and permanently restrained from terminating the tube license which had been granted to them, since they are not in default; that a credit of all royalties up to July 1, 1931, be granted; (this was apparently on the ground that the releases of all damages for past infringement given to the sixteen companies taking part in the September, 1931, settlement were granted without any consideration and that under § 7 of the original license agreement, such releases constituted retroactive licenses for a zero rate of royalty;) or, in the alternative, that there be a reduction in royalty from seven and one half per cent to five per cent under the same § 7, retroactive to November 1, 1929. The plaintiffs alleged that they had a valuable antitrust claim against the defendant, upon which they brought suit in December, 1931, in the Federal Court in Massachusetts; and that this claim would be destroyed by the execution of a general release such as was given by other licensees; that some of the outstanding licensees had no such valuable claims and that others of the new licensees who had such claims were paid for them in the settlement of September, 1931; that hence the plaintiffs were entitled to a total credit of royalties, or at least to such a reduction in royalties, without the necessity of executing a general release.

By an amendment to the original bill the plaintiffs tendered the defendant in March, 1932, a form of release (which they contended was unqualified), signed by the Raytheon Production Corporation. This form of release so tendered was drawn to exclude and preserve the antitrust

suit brought in December, 1931, in the Federal Court in Massachusetts. The defendant refused to accept such release.

Under the license agreement royalties were payable quarterly, and upon thirty days' notice of default the defendant could terminate the license. The plaintiffs had been in default each quarter beginning with the second quarter of 1931. In each case up to the date of the final decree, the defendant has notified the plaintiffs of their default, and the plaintiffs have finally paid the royalties without interest under a stipulation of nonprejudice.

The defendant filed a cross claim to the effect that the Raytheon Production Corporation must pay interest on royalty payments made after the due date to cure default, and that the plaintiffs have not paid royalties on the proper basis. It is alleged that all the tubes manufactured under the present license were sold exclusively to the National Carbon Company, Inc., which had a controlling interest in the licensee, the Raytheon Production Corporation, by reason of an option on its stock and a right to elect its directors. Accordingly, under § 5 of art. Three of the license agreement, royalties should have been computed upon the sales price of the National Carbon Company, Inc., rather than upon the sales price of the Raytheon Manufacturing Company. It is further alleged that in computing royalties improper deductions were made from the sales price of the licensee. Sections 1 and 2 of art. Three of the license provide that royalties shall be paid on the licensee's invoice price "before cash discounts, freight or advertising allowances, or similar deductions."

Upon the filing of the master's report and hearing thereon, an order was entered overruling the plaintiffs' objections to the report, sustaining the defendant's objection, and confirming the report after striking out certain findings not now material. It was further ordered that a final decree was to be entered in accordance with the following rulings: (a) the licensee is not entitled to a "zero rate" of royalty for any period after October 31, 1929; (b) the royalty is to be computed at the rate of seven and one half per cent from No-

vember 1, 1929, to September 18, 1931, since the licensee has not given a general release covering the plaintiffs' antitrust claims as required of other licensees; (c) after September 18, 1931, when licenses were granted to the group of sixteen licensees and settlements made with them, the royalty is to be computed at the rate of five per cent without requiring any general release covering antitrust claims, since no such release was required of these licensees without the payment therefor of a consideration and the final adjustment of their claims; (e) the five per cent rate is not to be retroactive to cover any period prior to September, 1931, since it does not appear that it was made retroactive in any of the other licenses; (f) the royalties are to be computed on the basis of the invoice (sales) prices of National Carbon Company, Inc., "before cash discounts, freight or advertising allowances, or similar deductions," but this computation is not to be retroactive to cover any period for which royalty payments were made before the filing of the bill in this case; (g) the defendant is entitled to interest on any amounts computed as above not paid when due from the due date thereof to the date of payment; (h) the licensee is entitled to interest on excessive payments, if any; (i) the balance due in accordance with the above computation to or from the defendant at the time of the entry of the final decree is to be paid; (j) the decree is to fix the amount of future royalties, subject to change in accordance with the terms of the agreement at five per cent upon the invoice (sales) prices of National Carbon Company, Inc., "before cash discounts, freight or advertising allowances, or similar deductions"; (k) upon the payment to the defendant of the amount, if any, due under this decree, the defendant is to be enjoined from doing any act toward terminating the license so long as the licensee makes royalty payments as herein fixed and in other respects conforms to the terms of the license.

At the hearing upon the form of the final decree a question arose as to the method of making allowances for inventories according to the basis for royalties established under the order of the court. The single justice declined to rule in

accordance with a request of the defendant that "the plaintiff should be credited with an amount equal to royalties paid at the rate of seven and one half per cent on the invoice price of all tubes held by National Carbon Company, Inc., in its inventory on March 31, 1931, with interest since that date. And the defendant should similarly be credited with all royalties at the rate of seven and one half per cent on the invoice price of all tubes held by the National Carbon Company, Inc., in its inventory on October 31, 1929, with interest since March 31, 1931."

An interlocutory decree was entered in accordance with the order of the court confirming the master's report, and from this the plaintiffs appealed. A final decree was entered in accordance with the above order and rulings. Both plaintiffs and defendant appealed.

1. The ruling was right to the effect that the plaintiffs were not entitled to a "zero rate" of royalty for any period after October 31, 1929. That contention of the plaintiffs is founded on the facts already narrated that certain companies granted licenses by the defendant in September, 1931, as a part settlement of controversies, had manufactured tubes, described in the patents under which the plaintiffs were licensed, from at least September, 1929; that the defendant exacted no payment for that use, and that thus a zero rate of royalty was granted them for that period, and that therefore the plaintiffs are entitled to the same rate under their license agreement. The soundness of that contention depends upon the correct construction of § 7 of art. Three of that agreement already quoted. The language of that section is couched solely in terms of future "licenses." It provides that, if the defendant "shall in the future grant another license . . . for future manufacture and sale" at a lower rate of royalty, then the licensee (that is, the plaintiffs) "shall thereafter have the benefit of such lower rate . . . ." There is nothing in these words about remissions or releases of damages that have accrued in the past for manufacturing without license. Giving the words of that section their natural meaning, they do not comprehend damages for infringement of the patents. The word

"royalty" commonly imports payment for permissive or lawful use of a property right, and not damages for a pirated or illegal appropriation of such property right. Damages for infringement may sometimes be ascertained by reference to royalty as a measure of value for the unlawful use, but damages are not thus transmuted into royalty. *Rude* v. *Westcott*, 130 U. S. 152, 165. *U. S. Frumentum Co.* v. *Lauhoff*, 216 Fed. Rep. 610, 617. The defendant was required by clauses in art. Three, § 7, to notify the licensee "upon the granting of such other license." The plaintiffs were entitled to a reduction in royalties only if the defendant granted "another license" and the plaintiffs accepted all the other conditions imposed in such other license. These terms are compatible with an express license alone and are irrelevant to damages paid for infringement. A release for damages accrued does not come within the scope of the language of § 7. A release for wrongs done in the past is not the equivalent of a license to do rightfully the same thing in the future. The adoption of the plaintiffs' contention would involve the granting of a zero rate to them upon mere release of damages for past infringement although no license were granted for the future.

This contention of the plaintiffs is not supported by the terms of their license agreement.

2. The ruling was right to the effect that the plaintiffs were required to pay royalty at the rate of seven and one half per cent from November 1, 1929, to September 18, 1931, because the plaintiffs had not given a general release covering their antitrust claims against the defendant as required of its other licensees. This ruling was founded on the facts already recited that when the defendant in September, 1931, made settlement with sixteen companies, it granted new licenses to them on a five per cent rate of royalty retroactive to November 1, 1929, to all existing licensees, each license containing a general form of release. The same offer of a five per cent rate conditioned upon giving the same general form of release was made to the plaintiffs and refused.

(a) The plaintiffs assail this ruling, first on the ground

that a general release had been tendered the defendant and that hence the finding on which the ruling was made was wrong. That alleged tender was made in March, 1932, three months after the present suit was instituted and six months after the offer of the defendant in September, 1931, had been refused by the plaintiffs. That tender was not unqualified in terms. Its paragraph 2 standing alone would have been unqualified in tenor. But it was preceded by a preamble containing the condition that it was "on its understanding of the effect of this release and in reliance thereon, as stated by counsel" for the defendant on a specified occasion which is set out at length. That statement in substance and effect was that the giving of a general release by the Raytheon Production Corporation, in whose name the tendered release was made, would in no way affect a suit pending in the Federal Court in the name of Raytheon Inc., under the antitrust acts against the defendant, and would in no respect prejudice the rights of the Raytheon Production Corporation because it had no rights in that suit. If the plaintiffs believed that statement was true in fact and sound in law, there was no reason why the general release in the form proposed by the defendant should not be executed. The insertion of this conditional preamble prevented the release tendered from being general and unconditional. The finding to this effect was not erroneous.

In any event the defendant had a right to decline to accept the form of release tendered. It was entitled under the explicit language (already quoted) of art. Three, § 7, of the license agreement, to insist that the plaintiffs accept "all the other conditions and obligations imposed" in the licenses issued to other licensees at the reduced rate. The offer of the defendant submitted to the plaintiffs and to all other licensees was to execute a general release according to a specified form. The other licensees that obtained a reduced royalty rate signed the general form. The defendant had a right under the license agreement to demand from the plaintiffs the execution of the same form of release as a condition to like reduction in rate.

(b) The plaintiffs contend further that, even if they do

not give a general release, the defendant is bound to concede the five per cent rate of royalty on sales between November 1, 1929, and September 18, 1931. That contention is based on the words of art. Three, § 7, of the license agreement to the effect that the licensee (the plaintiffs) is to have the benefit of the lower rate of royalty, "provided that the Licensee at the same time accepts all the other conditions and obligations imposed on the Licensees by such other license, and by any agreement referred to therein with any of the Licensors, and makes equal contributions to the Licensors." When the defendant made the settlement in September, 1931, new licenses containing a general form of release were granted to old licensees at a five per cent rate of royalty retroactive to November 1, 1929. The offer for such reduction was submitted to the plaintiffs and the execution of the general release was refused. That refusal was based on the contention that such a general release would wipe out the antitrust claims for $9,000,000, which were the subject of the suit then pending in the Federal court brought by the Massachusetts corporation, that other prior licensees had no antitrust claims to release, and that thereby the plaintiffs would be deprived of the express reservation from the effect of the general release preserved in paragraph (3) of the agreement accompanying the license agreement heretofore quoted. The contention in other words is that, since other licensees had no claims to give up, the execution of a general release of claims by the plaintiffs, the only ones having a good claim, in order to obtain the reduction in rate, would not be on the same "conditions" or making "equal contributions" within § 7. The master found, however, that the "Raytheon Production Corporation was in no way a party beneficial or legal or nominal to the Federal suit brought by Raytheon Inc. and now pending against" the defendant. In view of this express finding, which is not shaken by other documents or matters referred to in the record, it is difficult to see any reason why the plaintiffs should have refused to give a general release. If, however, it be assumed that the plaintiffs have an interest in the antitrust suit, which was pre-

served to them by paragraph (3) of the agreement accompanying the license agreement, nevertheless it cannot rightly be held that the requirement of the defendant of a general release from the plaintiffs imposed "conditions and obligations" different from those of other prior. licensees. The master found that the defendant in proposing in September, 1931, modifications to existing license agreements intended to obtain "releases broader than those contained in the original license agreements because of a suit brought against" the defendant in connection with receiving radio sets; he stated: "What was the basis of that suit did not appear. I find that the Ken-Rad Company, a licensee of the Radio Corporation of America had, prior to September 1, 1931, in some way brought to the Radio Corporation's attention that it might have antitrust claims." It may well have been that other licensees had claims not covered by the original releases and that they gave up valuable claims under the new and broader releases. At all events, the master does not find that they had no claims and found that at least one had an asserted claim. The plaintiffs have not proved the validity or worth of their antitrust claims. The master ruled that they were not entitled to prove before him the allegations in their pending antitrust suit and the plaintiffs made no objection.

It follows that, since the plaintiffs have not proved that the other prior licensees had no claims against the defendant given up by virtue of their general releases, and since the plaintiffs do not show a present interest in the pending Federal antitrust suit or the value or validity of the claim involved in that suit, it cannot be held that the requirement that the plaintiffs execute a general release imposes "conditions and obligations" greater than those imposed on other prior licensees or that thereby an unequal contribution was required. If the plaintiffs insist upon the reduction, they must do it under the terms of art. Three, § 7. They must accept all other conditions, obligations and terms imposed on other licensees. Every other licensee was required to give a general release. The plaintiffs cannot demand the reduction without complying with the

same terms. Even if the plaintiffs would surrender a larger claim than the other licensees, the terms of art. Three, § 7, of the license agreement are unequivocal. They must conform to the same conditions observed by the other licensees.

3. The exaction of a release of claims falls within the fair meaning of the phrase "conditions and obligations" in its context in § 7. The requirement of a release was a part of the original license agreement of which § 7 was also a part. It was a condition compliance with which by the plaintiffs was necessary to obtain the license in the first instance. It is just as much of a condition to obtain a reduction in royalty rate as it was to obtain the initial license.

4. The contention that the parties have by their conduct put a practical construction upon § 7 in conformity to the interpretation now urged by the plaintiffs cannot be supported. As already pointed out, we do not regard the terms of that section ambiguous. It is only in such instances that construction by acts of the parties is permissible to affect its language. The finding of the master is that, so far as it was a question of fact, at no time has there been a practical construction by the parties of that section. It is not necessary to recite in detail the evidence set forth in the master's report. We are of opinion that there was not as matter of law any such practical construction by the parties.

5. The circumstance that other licensees in the September, 1931, settlement were paid for a release of their antitrust claims does not show that an unequal contribution was exacted from the plaintiffs by requiring them to give up their antitrust claim by general release without being paid in like manner. Those licensees that were paid in a group for release of such antitrust claims were not prior licensees but were manufacturers that then became licensees for the first time. They were on a different footing from the plaintiffs and other prior licensees. The exaction of a general release from them as a condition for a five per cent royalty in the future had nothing to do with the exaction of a general release from prior licensees as a

condition for a retroactive rate of five per cent royalty for the past and a like rate for the future. So far as the past rate was concerned, all prior licensees were required to execute a general release in order to obtain it and no one of them was paid therefor. The plaintiffs stood in this respect on an equality with the others.

6. The ruling was right to the effect that the plaintiffs are entitled to the five per cent royalty rate from September 18, 1931, when licenses were granted to the group of companies as above stated without the necessity of executing general releases covering antitrust claims, because no such releases were required of these licensees without payment therefor of a consideration and a final adjustment of their claims. The defendant's objection to this ruling cannot be sustained. It is not supported by the fair construction of art. Three, § 7. It is true that the plaintiffs, in order to secure a reduction in royalty, were obliged to comply with the conditions and obligations imposed on the licensee. One of these was the execution of a general release. But, so far as concerned the new licensees, the force and effect of this condition were dependent upon and qualified by the fact that a settlement was made with them and they were paid for their antitrust claims. The complete "conditions and obligations" was the giving of a general release coupled with the settlement of claims by a very substantial payment. The plaintiffs were entitled to the same treatment if held to the same obligation. Otherwise, a different condition would be imposed on the plaintiffs and an unequal contribution required of them. The fact that the amount paid each licensee is not shown is immaterial. The total payment was a very large sum. The distribution of it is of no consequence in determining the rights of the plaintiffs. In this connection the circumstance that the Raytheon Production Corporation had no interest in the pending antitrust suit is not decisive. That corporation apparently entertained the view that it had some sort of interest in it because of the conditional form of release tendered by it. The plaintiffs were entitled under the reservation in paragraph (3) of the agreement accompanying the original license agreement to retain

rights of antitrust claims in stated conditions.   There was doubt in the minds of the plaintiffs as to the effect of a general release on their rights.   It is to be presumed that this was an honest doubt and an honest claim.   It apparently was brought to the attention of the defendant.   In all the circumstances the plaintiffs were entitled to the same treatment as the others to which some settlement of claims was proffered.   The failure of the defendant to adjust or to settle this claim of the plaintiff, while demanding of it a general release, entitled it to the five per cent royalty rate from September 18, 1931, without giving a release.

It remains to consider questions raised by the cross bill of the defendant.   The contentions on this branch of the case relate chiefly to matters of accounting.   The details are to be adjusted later by agreement, and the master made no findings on them.   The governing principles alone need be considered.

7.  The ruling was right to the effect that the defendant was entitled to interest on royalties not paid when due from the due date to the time of payment.   *Childs* v. *Krey*, 199 Mass. 352, 358.

8.  There has apparently been sharp controversy between the parties concerning the point whether the license royalties due to the defendant should be computed on the sales price of the National Carbon Company, Inc., to which all the product of the plaintiffs was sold.   The plaintiffs state in their brief: "On all sales after March 31, 1931, the single justice has ordered that the royalties should be based on the invoice price of National Carbon Company, Inc.   The defendant contended for this.   The plaintiffs opposed it.   The plaintiffs no longer oppose it.   It is agreed that the final decree conforms to this order."   In view of this statement, the main matter needs no further discussion.

9.  The defendant contends, however, that the limitation to the date of the suit was error and that the computation should be retroactive to cover earlier royalty payments. This limitation rightly may have rested on laches of the defendant.   Although laches cannot be asserted as matter

of right unless set up in the pleadings, it is always open to a court of equity in its discretion to do what justice and fair dealing require as to delay in making claims. *Stewart v. Joyce*, 201 Mass. 301, 307–308. *Hays* v. *Port of Seattle*, 251 U. S. 233, 239. Nothing to the contrary was decided in *Rolikatis* v. *Lovett*, 213 Mass. 545, 548. There is justification for the limitation imposed by the decree. The master found: "but the defendant sets up in its cross claim a contention, never made by it prior to the filing of that pleading, that, under the license agreement, it is entitled to a different method of account. The Radio Corporation of America had a copy of the price schedule of Document H some time prior to October, 1930, and examined the books of the Raytheon Manufacturing Company in January, 1931." Correspondence between the parties printed in the record shows that the defendant knew of the arrangement between the plaintiffs and the National Carbon Company, Inc. Mere delay without a showing of some resulting prejudice to the other party often does not constitute laches. This matter related to the internal arrangements of closely affiliated corporations. The defendant, knowing the facts, continued to accept payments on the basis put forward by the plaintiffs. It cannot be presumed that, if timely objection had been made by the defendant, some other arrangement might not have been made.

10. The remaining contention of the defendant is that there was error in the rulings as to royalties on tubes held in inventory by the National Carbon Company, Inc. The defendant claimed royalties on inventory so held on October 31, 1929. An express credit was given by the defendant on all royalties paid on tubes up to that time. That must have included tubes held in inventory at that time. The defendant now can hardly in equity exact a credit for royalties on tubes which had once been paid and which had once been credited or rebated.

The royalties had been paid on the basis adopted by the parties to March 31, 1931, which was the invoice price to the National Carbon Company, Inc. It may have been

thought that this should close the transaction on that point.

Moreover, the terms of the several sections of art. Three of the license agreement which is entitled "Royalties" do not lend support to this contention of the defendant. That article in its several sections contains no allusion to royalties on tubes held in inventory. The basis for the payment of royalty is the invoice price of tubes sold by the licensee during the term of the agreement. Express provision is made by § 5 of art. Three for resale by one occupying the relation to the licensee held by the National Carbon Company, Inc. If the parties had intended tubes held in inventory as a basis for royalty, some reference naturally would have been made to the subject.

Points argued by the defeated parties have been considered. They need not be discussed further. Those not argued are treated as waived. No error is shown.

*Interlocutory decree affirmed.*

*Final decree affirmed with costs.*