CORE LABORATORIES, INC., Appellant, v. HAYWARD-WOLFF RE-
SEARCH CORP., Appellee.

(*December* 9, 1957.)

(Reargument denied January 6, 1958.)

WOLCOTT and BRAMHALL, Justices, and SEITZ, Chancellor,
sitting.

*Thomas Cooch* and *William C. Conner* (of New York) for
appellant.

*Edwin D. Steel* and *Harold J. Birch* (of Washington) for
appellee.

Supreme Court of the State of Delaware, No. 32, 1957.

Wolcott, J.:

This is an appeal from an order of the Superior Court entered in an action for a declaratory judgment granting the motion of Hayward-Wolff Research Corp., appellee, (hereafter Hayward) for summary judgment; and denying a similar motion of Core Laboratories, Inc., appellant, (hereafter Core).

The controversy between the parties arises over the liability of Core to Hayward for the payment of royalties under an agreement licensing Core to use certain patents owned by Hayward covering methods and apparatus for the logging of oil wells.

There is no issue of fact between the parties, the pertinent facts having been stipulated. The record before us consists of this stipulation of fact and pleadings. The facts of the cause are as follows:

Prior to 1949 one Hayward and one Rosaire were issued patents covering oil well logging operations. Both individuals sought to license under their respective patents companies engaged in well logging. There were three major companies at the time engaged in such operations. One, the Baroid Division of National Lead Company (hereafter Baroid) accepted a license of the Hayward patents. The second, Hycalog, Inc. (hereafter Hycalog) accepted a license of the Rosaire patents. The third, Core, refused to take a license from either patentee.

The Hayward patents were ultimately assigned to the appellee, Hayward, which in 1949 sued Core for infringement. In 1950 this suit was settled by the acceptance by Core of a license stipulating royalty payments and a waiver on the part of Hayward of all claims for past infringements by Core.

The 1950 license agreement accepted by core provided, *inter alia*:

(a) That Core would be relieved of the requirement of making royalty payments unless Hayward failed to license "one or more of the presently unlicensed principal operators" in-

fringing the Hayward patents, or if 25% or more of well logging operations in the United States covered by the Hayward patents shall be unlicensed by Hayward; and

(b) In paragraph 11 as follows:

"Licensor agrees that in the event Licensor shall have entered into or shall hereafter enter into any license agreement, or shall have modified or shall modify any existing license agreement (except that with Baroid Sales Division, National Lead Company), covering similar operations in the United States, providing for a lower or more advantageous royalty rate or for any other terms or conditions more favorable to the Licensee than herein set forth, then and thereafter, Licensee shall have the benefit of such lower or more advantageous terms, conditions or royalty rate."

In 1953 Core notified Hayward that it was suspending its royalty payments because more than 25% of well logging operations in the United States was an unlicensed infringement of Hayward patents and that Hycalog was one of the principal infringers.

Upon receipt of the notification of suspension of royalty payments, Hayward sued Core for unpaid royalties. Shortly thereafter Core then learned for the first time that Hayward in 1951 had attempted to license Hycalog but that Hycalog had refused to accept a license under the Hayward patents because it was then operating under a license for the use of the Rosaire patents, the validity of which was at that time being contested in litigation instituted by Rosaire against Baroid, the Hayward licensee. Upon Hycalog's refusal to accept a license under the Hayward patents, Hayward agreed not to sue Hycalog for infringement until the termination of the Rosaire-Baroid litigation, and Hycalog in turn agreed not to raise the defense of *laches* against Hayward in any such suit brought after the termination of the Rosaire-Baroid litigation.

Thereupon, in October 1953 Core and Hayward settled the action brought by Hayward for unpaid royalties under the 1950

license agreement by Core agreeing to pay one-half of such unpaid royalties and, by agreement, to amend Core's license of 1950 to provide that Core would not be obligated to pay royalties to Hayward after the expiration of 60 days following the final determination of the Rosaire-Baroid litigation unless at such time Hycalog shall have been licensed by Hayward or, in the alternative, Hayward had sued Hycalog for infringement of its patents.

In 1955 the Rosaire-Baroid litigation was finally concluded, resulting in the invalidation of the Rosaire patents. Thereupon, Hayward promptly sued Hycalog for infringement of its patents, seeking damages for Hycalog's past infringements.

In September, 1955 Hycalog and Hayward reached an agreement. This agreement provided that Hycalog would be given a paid-up license to use Hayward's patents running from October 1, 1955 through the life of the patents in return for a payment by Hycalog of $50,000 payable in monthly installments. Hayward also waived any claim for damages for infringement of its patents by Hycalog prior to October 1, 1955. By agreement the suit instituted by Hayward against Hycalog for infringement was dismissed without prejudice.

On November 17, 1955 Hayward notified Core of its agreement with Hycalog and offered Core a paid-up license for the remaining life of its patents for the sum of $50,000.

Core refused Hayward's offer on the ground that it had paid Hayward a total sum of $61,000 as royalties since the time Hayward promised not to sue Hycalog pending the determination of the Rosaire-Baroid litigation, and that Hayward in effect, by granting a paid-up license to Hycalog from October 1, 1955 and waiving its claim for damages for past infringement, had granted Hycalog a paid-up license to use its patents commencing in 1951 for the sum of $50,000. Core maintained that the provisions of ¶11 of its license agreement of 1950 thereupon obligated Hayward to grant it, Core, a similar paid-up license for the sum of $50,000 and, accordingly, that Hayward should re-

imburse Core to the extent of approximately $11,000. Hayward rejected this demand by Core.

Core then instituted in the Superior Court of New Castle County this action for declaratory judgment, seeking to have its rights under the license agreement of 1950 established and, at the same time, claiming the sum of approximately $11,000 from Hayward. Hayward filed its answer, counter-claiming for royalties allegedly due it from Core.

The Superior Court granted judgment for Hayward upon the authority of *Universal Oil Products Co. v. Vickers Petroleum Co., 2 Terry* 238, 19 *A.* 2d 727, and entered an order establishing Core's liability for the payment of royalties under its license agreement to the time at which Hayward had offered Core a paid-up license for the total sum of $50,000, and further ordering Core to make the monthly installments due on the said sum of $50,000. From this order Core appealed.

Core's position is that the agreement in 1951 between Hayward and Hycalog, under which Hayward agreed not to sue Hycalog until the determination of the Rosaire-Baroid litigation, was the full equivalent of a license to Hycalog for a limited period of time, since the substance of a license to use a patent is a waiver by the patent owner of his right to sue for infringement, and that Hayward's subsequent waiver of damages for the period covered by the license for a limited period of time transformed this license into a royalty-free one for that period. It is, therefore, contended that under paragraph 11 of its license agreement with Core, Hayward is obligated to give Core the same favored treatment. The argument thus made is based upon the contention that in determining the rights of parties under license agreements courts look to the "end result" to determine the relationship, and that this test means that Hycalog was granted a royalty-free license for that period.

*Universal Oil Products Co. v. Vickers Petroleum Co., supra,* is not attacked by Core as bad law, but Core seeks to distinguish that case from the case now before us.

The Universal Oil Products case dealt with the following situation:

. Universal granted Vickers a non-exclusive license on Vickers' promise to pay royalties. This license agreement contained a most-favored licensee clause almost identical with paragraph 11 of the Core license agreement. Vickers contended in the suit brought to collect the royalty payments that under its agreement with Universal it was excused from such payments because the failure of Universal to sue infringers of its patents and the subsequent waiver by Universal of its claim for damages for such infringement when it granted formal licenses to such infringers had, by implication, granted those infringers royalty-free licenses for the period. The Superior Court held that the action by Universal did not create an implied retroactive license. It also held that the most-favored licensee clause in Vickers' agreement operated *in futuro.*

As we have pointed out, the parties before us agree that *Universal Oil Products Co. v. Vickers Petroleum Co.* was properly decided. That it was so seems apparent from authorities in other jurisdictions. Cf. *Raytheon Mfg. Co. v. Radio Corp. of America,* 286 *Mass.* 84, 190 *N. E.* 1; *Guggenheim v. Kirchhofer,* 2 *Cir.,* 66 *F.* 755; *De Forest Radio Telephone & Telegraph Co. v. U. S.,* 273 *U. S.* 236, 47 *S. Ct.* 366, 71 *L. Ed.* 625.

Core, however, says that the Vickers case is distinguishable on its facts from the case at bar and is, therefore, not authority for the entry of a judgment against it. Core points out that in the Vickers case there was no agreement on the part of Universal not to sue the infringers for a period of time; that there was no covenant in the Vickers license agreement to protect Vickers against non-licensed competition, and that the court, itself, in the Vickers case, distinguished cases such as the instant one.

We think, as did the trial court, that the attempted distinguishing features raised by Core to avoid the implications of the Vickers case are in fact not material distinctions.

With reference to the agreement on the part of Hayward not to sue Hycalog for a limited period of time, the record shows that the negotiations between Hayward and Hycalog at that time, which had started with a demand on the part of Hayward that Hycalog accept a license, demonstrate not only that that was Hayward's purpose, but also that Hycalog throughout rejected any demand that it accept a Hayward license. This is clear from the reliance by Hycalog for its refusal upon its license under the Rosaire patents. In substance, Hycalog's position was that it was not infringing Hayward's patents.

The sum total of this agreement not to sue was merely to postpone Hayward's claim against Hycalog for infringement to await the ultimate decision of the validity of the Rosaire patents in which Hayward obviously had an interest since its patents covered the same operation. In return for its agreement not to sue during this time, Hycalog agreed not to take advantage in any subsequent suit of Hayward's delay in the enforcement of its rights.

It seems to us that by no stretch of the imagination can this agreement be distorted into the grant of a license by Hayward to Hycalog. Indeed, the opposite, it seems to us, is the fact for there would have been no purpose to the agreement if a license had been intended to be granted. Hycalog consistently rejected a demand that it accept a Hayward license on the ground that the Hayward license did not cover its operations.

It is also quite apparent that at the time the agreement not to sue for a limited time was entered into, Hayward did not waive its claim for damages for the infringement of its patents by Hycalog. This conclusion is pointed up by the fact that as soon as it could sue Hycalog for damages for past infringement, Hayward did so.

But Core argues further that the agreement not to sue, coupled with the subsequent waiver of damages for infringements occurring within the non-suable period, amount in law to an

implied grant of a royalty-free license for the period by Hayward to Hycalog. We do not agree.

Since the agreement not to sue for a limited period does not of itself amount to a license, we think the subsequent waiver of a claim for damages for the period will not impliedly make it one. By its very nature, a patent license is prospective in operation, with the consequence that the waiver of a claim for damages for past infringement does not of itself impliedly create one. *Universal Oil Products Co. v. Vickers Petroleum Co., supra.* Furthermore, no implied license results in circumstances which demonstrate disagreement between the parties, since an implied license can arise only from conduct of the parties which force the conclusion that they are in accord. *Duval Sulphur & Potash Co. v. Potash Co. of America,* 10 *Cir.,* 244 *F.* 2d 698. The record before us demonstrates that from 1951 to 1955 Hayward and Hycalog, far from being in accord, were in fact in absolute disagreement, with Hayward insisting that Hycalog accept a license and Hycalog consistently refusing to do so. As a matter of fact, Hycalog was ultimately licensed by Hayward only after suit had been brought against it. We think the waiver of Hayward's claim for damages after Hycalog's acceptance of a license was the legitimate exercise of business judgment in the final settlement of a controversy of long standing.

The second purported distinction raised by Core is that the Vickers license agreement contained no covenant on the part of Universal to protect Vickers from unlicensed competition. While it is true that the Core license contained such a provision, Hayward's obligations under that covenant were performed when it brought suit against Hycalog for past infringement.

Finally, Core points out that the court in the *Vickers* case distinguished the cases of *Luton v. Bearce,* 219 *F.* 237; *DeForest R. T. & T. v. R. C. A., supra;* and *St. Joseph Iron Works v. Farmers Mfg. Co.,* 106 *F.* 2d 294, as cases of an implied license resulting from estoppel arising from something more than mere

inactivity of the defendant. Core disclaims any intention to rely on the cases distinguished in the *Vickers* case, but emphasizes that the court in the *Vickers* case expressly made it inapplicable to situations in which the patent owner was guilty of more than mere inaction. Core, of course, says that Hayward was more than merely inactive in this instance, and that therefore the *Vickers* case is inapplicable.

We have difficulty in understanding the argument. We have found that the 'more than mere inaction of Hayward' did not result in the granting of an express license to Hycalog, which would seem to put the case squarely in line with the situation before the court in the *Vickers* case, unless it falls within the exception distinguished. That exception is the situation where the affirmative actions of the patent owner permit the raising of an estoppel against him from denying the existence of a license. Core disclaims any such argument in the case before us, but says that its case has in common with the exception to the *Vickers* case that the patent owner was guilty of more than mere inaction. We do not understand the significance of the point since the next logical progression is that Hayward's 'more than inaction' is sufficient to estop it from denying the grant of a license to Hycalog. Core, however, expressly refrains from taking this next step. The argument is left hanging. In any event, however, we think Hayward's actions are not sufficient to estop it from denying the grant of a royalty-free license to Hycalog during the period of forbearance to sue.

Finally, we think the record demonstrates that Hayward acted in good faith in all of these dealings. This makes the agreement of 1951 on Hayward's part not to sue Hycalog for a limited period of time legally without significance on the issue before us. We are not called upon to decide whether or not "the end result" theory advanced by Core, under circumstances requiring the imputation of a lack of good faith on the part of the licensor, would result in the granting of an implied royalty-free license. The lack of any showing of an intent on the part of Hayward to get around its agreement with Core for the bene-

fit of Hycalog puts the case before us in the same posture as the case before the court in *Universal Oil Products Co. v. Vickers Petroleum Co.* Since this case is not attacked as erroneous, and since we are of the opinion that it was correctly decided, we think the Superior Court was correct in entering a judgment for Hayward upon the authority of the *Vickers* case.

We affirm the judgment of the court below establishing the rights of Core and Hayward under their license agreement of 1950 as amended in 1953, and holding that Core, pursuant to its election under paragraph 11 of that agreement to accept a paid-up license for the life of the Hayward patents, owes Hayward the sum of $50,000.00, payable at the rate of $500 per month. We give leave to Core, however, to apply to the court below for such modification of the terms of the judgment actually entered as may be required to make its paid-up license conform in detail with the paid-up license granted Hycalog, specifically with reference to the effective beginning date of such license.

The judgment below is affirmed, with leave to the Superior Court to modify it as necessary to conform to this opinion.