No. 05-6844-cv
Davis v. Blige

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: January 10, 2007                    Decided: October 5, 2007)

Docket No. 05-6844-cv

SHARICE DAVIS,

  *Plaintiff-Appellant*,

  v.

MARY J. BLIGE, BRUCE MILLER, RONALD LAWRENCE, KWAME HOLLAND, DANA STINSON, AUSAR MUSIC, MARY J. BLIGE PUBLISHING, BRUCE MILLER PUBLISHING, KWAME HOLLAND PUBLISHING, MARY J. BLIGE MUSIC, DAYNA S. DAY PUBLISHING, WARNER-TAMERLANE MUSIC PUBLISHING CORP., UNIVERSAL MUSIC GROUP, INC., UNIVERSAL STUDIOS, INC., UNIVERSAL MUSIC PUBLISHING GROUP, UNIVERSAL-MCA MUSIC PUBLISHING, UNIVERSAL MUSIC & VIDEO DISTRIBUTION CORP., and MCA RECORDS, INC.,

  *Defendants-Appellees.*

Before: WINTER and CABRANES, *Circuit Judges,* and KORMAN, *District Judge.*[1]

Plaintiff appeals from an order of the United States District Court for the Southern District of New York (Charles S. Haight, Jr., *Judge*) granting defendants' motion for summary judgment on plaintiff's copyright-related claims. The District Court concluded that (1) plaintiff's co-author transferred his rights under copyright to one of the defendants through a written agreement; (2) the transfer, which stated that it was "retroactive" to the date of the creation of the copyright, took effect before the alleged infringement; and (3) the "retroactive" transfer barred plaintiff's claim of infringement against the defendant, who was the beneficiary of the transfer, and his licensees. Plaintiff argues on appeal that the retroactive transfer was invalid and that plaintiff's claims were not barred by

---

[1] The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

the transfer.

Vacated and remanded.

RICHARD J. J. SCAROLA (Alexander Zubatov, *on the brief*), Scarola Ellis LLP, New York, NY, *for Plaintiff-Appellant.*

JONATHAN D. DAVIS, New York, NY, *for Defendants-Appellees Mary J. Blige and Mary J. Blige Music.*

Cynthia S. Arato, Gibson Dunn & Crutcher LLP, New York, NY, *for Defendants-Appellees Warner-Tamerlane Publishing Corp., Dana Stinson, and Dayna's Day Publishing.*

Andrew H. Bart, Jenner & Block LLP, New York, NY, *for Defendants-Appellees Universal Music Group, Inc., Universal Studios, Inc., Universal Music Publishing, Inc., Universal-MCA Music Publishing, a division of Universal Studios, Inc., Universal Music & Video Distribution Corp., and MCA Records, a division of UMG Recordings, Inc.*

Gregory J. Watford, New York, NY, *for Defendants-Appellees Ronald Lawrence and Ausar Music Publishing, Ltd.*

George T. Gilbert, New York, NY, *for Defendant-Appellee Bruce Miller.*

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented, one of first impression in the courts of appeals, is whether an action for infringement by one co-author of a song can be defeated by a "retroactive" transfer of copyright ownership from another co-author to an alleged infringer. This action arises under the current statute governing copyright law, the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* ("the Copyright Act"), because "the complaint is [in part] for a remedy expressly granted by [the Copyright Act], e.g., a suit for infringement . . . , [and] asserts a claim requiring construction of [the Copyright Act], . . . or, at the very least . . . presents a case where a distinctive policy of [the Copyright Act] requires that federal principles control the disposition of the claim." *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 828 (2d Cir. 1964) (Friendly, J.).

2

Plaintiff Sharice Davis ("plaintiff" or "Davis") appeals from an order of the United States District Court for the Southern District of New York (Charles S. Haight, Jr., *Judge*) dismissing by summary judgment her claims under the Copyright Act, her claim for a declaratory judgment under 28 U.S.C. § 2201, and her state-law claims alleging unfair competition, unjust enrichment, and violations of New York's consumer protection statutes. *See Davis v. Blige*, 419 F. Supp. 2d 493 (S.D.N.Y. 2005). The District Court concluded that a "retroactive" written agreement between Bruce Chambliss, Davis's alleged co-author, and Bruce Miller, one of the defendants, purporting to assign Chambliss's rights in two disputed songs as of the time of their creation, was valid. Reasoning that "a co-owner has a legal right to grant a license without another co-owner's permission or transfer his rights in the copyright freely," *id.* at 500, the District Court held that the transfer of co-ownership rights by Chambliss to Miller—who had licensed the copyright to third parties also named as defendants (collectively the "third-party defendants") before the written agreement was executed—defeated Davis's claims not only against Miller but also against the third-party defendants, who were in privity with Miller.

We disagree, and therefore vacate the judgment and remand for further proceedings consistent with this opinion.

## BACKGROUND

### A. Facts

The facts of this case are laid out fully in Judge Haight's opinion. We recount here only those facts relevant to the issues on appeal. Unless otherwise noted, the facts are undisputed.

The dispute between the parties arises from the release in 2001 of an album entitled "No More Drama" ("the Album"). Defendant Mary J. Blige, the "Queen of Hip-Hop Soul," J.A. 325, was the performer on the Album, which achieved "triple platinum" status.[2] Davis alleges that two of the songs

---

[2] "Platinum" status, a term of art of musical-recording sales certification created by the Recording Industry Association of America, refers to the sale of over one million copies of a musical recording. Thus, "triple platinum" status means over 3 million copies of the Album were sold. *See* Recording Industry Association of America, Gold and

contained on the Album—"LOVE" and "Keep It Moving" (collectively, the "Album compositions")—infringe her copyright in two compositions (collectively, the "disputed compositions"). In particular, she claims that "LOVE" is virtually identical to her composition "L.O.V.E.," and that "Keep It Moving" bears substantial similarity to her composition "Don't Trade in My Love." Davis does not receive any song-writing credit on the Album; instead, the labels and packaging of the Album identify (1) Blige, Miller, and defendants Kwame Holland and Ronald Lawrence as the authors of "LOVE" and (2) Blige, Miller, Holland, and defendant Dana Stinson as the authors of "Keep It Moving." *See id.* at 495 n.2.

Davis claims the disputed compositions were co-authored in 1998 by her and Chambliss, Miller's father; Chambliss is not a party to this action. According to one witness, Hunter College Professor Barbara Ottaviani, the disputed composition "L.O.V.E." was written in 1998 during jam sessions in the home of Ottaviani attended by, among others, Davis, Chambliss, and Miller. A tape recording of "L.O.V.E." was made during one of these jam sessions, but the tape disappeared shortly thereafter. At about this time Davis met Blige, who is Miller's sister and the step-daughter of Chambliss. Davis states that she had performed "L.O.V.E." for Blige and that Miller subsequently approached Davis on behalf of Blige, seeking to buy several of Davis's songs, including "L.O.V.E." Davis alleges that she declined the offer. She also alleges that she wrote "Don't Trade in My Love" with Chambliss in or around November 1998 at Ruff Riders Studio.

In August 2001, defendants Ausar Music, Mary J. Blige Publishing, Bruce Miller Publishing, and Kwame Holland Publishing registered "LOVE" and defendant Universal Music MCA Music Publishing, and Blige, Miller, and Stinson registered "Keep It Moving" with the United States Copyright Office ("Copyright Office"). On February 28, 2002, Miller contracted with Universal Tunes, a division of defendant Universal, Inc., to provide an exclusive license to exploit his copyright interest

Platinum, http://www.riaa.com/goldandplatinum.php (last visited Aug. 8, 2007).

in the Album compositions as well as his copyright interests in any other compositions not previously assigned to other music publishing companies. On August 14, 2002, Davis registered the disputed compositions with the Copyright Office, listing Chambliss as a co-author. In December 2003, Davis filed suit, alleging infringement of her copyright in the two disputed compositions and a variety of related state claims.

Defendants' April 30, 2003 and August 11, 2003 answers to Davis's complaint denied that anyone other than the defendants listed as authors on the Album wrote the songs. But in depositions given in December 2003 and January 2004 (Miller), and June and August 2004 (Chambliss), both Miller and Chambliss testified that *Chambliss* had initially written the disputed compositions and that they formed the basis for the Album compositions;[3] Chambliss denied ever collaborating on any songs with Davis.[4] Chambliss and Miller also stated that they had orally agreed Chambliss would grant Miller certain rights in the compositions, although the existence and nature of the alleged oral agreement is in dispute.[5] *See Davis*, 419 F. Supp. 2d at 498 (noting that "a genuine issue exists as to whether Chambliss

---

[3] Miller testified that he and Blige contributed to the "revised" version of "LOVE."

[4] Chambliss's deposition testimony is somewhat confused on this point. Although during his deposition he categorically denied ever having written songs with Davis, Chambliss identified several instances in which Davis's handwriting or name appeared in his papers documenting several songs. Chambliss explained this documentation as either identifying songs meant for her as a performer, or areas where she added unauthorized verses.

[5] Miller's and Chambliss's deposition testimony contain inconsistent descriptions of the nature and timing of the alleged oral agreement. Miller stated during his deposition that he and Chambliss had a conversation "[p]robably like the end of '98, '99 . . . somewhere in there," during which Chambliss told him, "basically, 'Any song that I have written, if it needs to be used at any point in time, use it. It is yours.'" Miller said that this agreement was never written down, and that he never compensated Chambliss for any songs that Chambliss had given to him.

According to Chambliss, he "sign[ed] all of [his] songs over to [Miller]" because he "knew [Chambliss] was going to be in prison, and [he] knew [Miller] could handle everything." Chambliss also described the alleged oral agreement alternatively as an agreement that "[Miller] can *use* all of [the songs]." As the District Court noted, however, Chambliss was incarcerated sometime in 1997, and again from 2001 to 2003; thus, it appears that Chambliss could not have known "he was going to be in prison" during late 1998 or early 1999, when Miller says that the oral agreement was reached. *See Davis*, 419 F. Supp. 2d at 498. It is also worth noting that it is unclear whether the oral agreement (assuming *arguendo* that it existed) transferred all of Chambliss's interests in his compositions to Miller, or whether Chambliss merely intended to grant Miller only the right to *use* Chambliss's compositions. Finally, it is unclear whether the alleged agreement related only to the disputed compositions, or whether the agreement related to all of the 3000-4000 compositions that Chambliss claimed to have created.

5

ever orally transferred his rights in the [disputed] compositions"). On June 23, 2004, one day before Chambliss's initial deposition, Chambliss and Miller allegedly reduced to a writing the transfer of Chambliss's interest in the disputed compositions.[6] There were two written agreements (collectively, the "transfer agreements"), one for each of the disputed compositions. Each written agreement stated that Chambliss "does hereby sell, assign, transfer, and set over unto Bruce Miller . . . an undivided one hundred percent (100%) share in and to all the undersigned's right, title and interest" in the respective disputed compositions "and any and all universe-wide copyrights and all renewals, extensions and reversions thereof [and] any and all causes of action for infringement of the same *past, present, and future*; any and all proprietary rights; and all the proceeds from the foregoing accrued and unpaid and hereafter accruing." (emphasis added). According to the transfer agreements, the "instrument of transfer is effective as of the date [Chambliss] first create[d] the above-referenced Composition"—a date not otherwise specified. Defendants claimed that these written agreements merely served to confirm or

---

[6] When asked during his first deposition on June 24, 2004, if there was any written agreement memorializing the transfer of his interest to Miller, Chambliss first said "No, he's my son, I don't need a written agreement." But when questioned further, he changed his answer and stated, "Yeah, there is a signed document." When asked about the details of that signed document, Chambliss responded:

Q. . . . Do you recall what songs were listed on that document?
A. L-O-V – I'm not sure.
Q. Do you remember if there any other songs besides L-O-V-E that were listed?
A. I'm not positive.
Q. Do you know if there were more than five songs listed?
A. I'm not positive.
. . . .
Q. Do you know why [Miller] was asking you to sign that document?
A. Yes.
Q. Why?
A. Because he was trying to sell them [the songs].
Q. Do you know who he was going to try to sell them to?
A. Not right offhand. There was a lot of songs.

The alleged agreement was not made available to Davis, however, until August 8, 2004—the day before Chambliss's *second* deposition—when *two* written agreements transferring Chambliss's rights in the disputed compositions (but no others) to Miller were shown to Davis. The District Court took note that Chambliss's vague testimony during his June 24, 2004 deposition appeared to be inconsistent with the written agreements that he allegedly signed the day before, *see Davis*, 419 F. Supp. 2d at 498 ("Chambliss was unable to recall the day, or even the month, in which he executed the written agreement[s], despite the fact that [they are] dated June 23, 2004, the day before the Chambliss deposition was taken"), but nonetheless gave legal effect to the written agreements, *see id.* at 499.

ratify the prior oral agreement.

**B. Procedural History**

Davis's complaint alleges that defendants infringed her copyright to the disputed compositions by (1) recording and registering copyrights on "LOVE" and "Keep It Moving," which were substantially similar to her compositions, and (2) falsely attributing authorship to (a) Blige, Miller, Holland, and Lawrence on "LOVE" and (b) Blige, Miller, and Stinson on "Keep It Moving." Davis also alleges that defendants falsely designated the origin of their goods in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a);[7] engaged in unfair competition; and were unjustly enriched. Finally, she claims that defendants' acts were intentionally designed to mislead the public in violation of N.Y. Gen. Bus. Law §§ 349 and 350.[8]

Following the completion of discovery, defendants moved for summary judgment on the ground that Chambliss had transferred his rights in the disputed compositions to Miller through an oral agreement before the compositions were used by Miller, or, alternatively, on the ground that the written transfer agreements conveyed the copyrights retroactively. *See Davis*, 419 F. Supp at 489-99. Defendants argue that, as a result of the transfer agreements, Miller became a co-owner of the disputed compositions as of the date of the creation of the compositions. Accordingly, they contend that, because Davis cannot sue a co-owner of her copyright for infringement, Davis's suit is barred against Miller and those to whom Miller had licensed the disputed compositions (including Blige and the other defendants).

The District Court agreed. In a memorandum and order filed November 22, 2005, it declined

---

[7] Davis did not respond to defendants' motion for summary judgment on this claim, and does not appeal the resulting dismissal of her Lanham Act § 43(a) claim.

[8] N.Y. Gen. Bus. Law § 349 reads in relevant part as follows: "(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

N.Y. Gen. Bus. Law § 350 reads in relevant part as follows: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

to determine whether the written ratification of a prior oral transfer could satisfy the Copyright Act's requirement that transfers of copyright ownership be in writing, 17 U.S.C. § 204(a), or whether the transfer agreements indeed ratified a prior oral agreement between Chambliss and Miller. Instead, it held that Chambliss could "cure past infringement" through the grant of a retroactive assignment of the copyright. *Davis*, 419 F. Supp. 2d at 500 (quoting *Silberstein v. Fox Entm't Group, Inc.,* 424 F. Supp. 2d 616, 629 (S.D.N.Y. 2004)). Because there is no appellate case law on the issue of retroactive assignment of copyright, the District Court relied on other district court opinions, among them *Silberstein*, 424 F. Supp. 2d at 629 (holding that a retroactive license, obtained after alleged infringement occurred and after institution of legal action, immunized defendant from infringement); *Country Road Music, Inc. v. MP3.com, Inc.,* 279 F. Supp. 2d 325, 329 (S.D.N.Y. 2003) (concluding that a settlement agreement between defendants and co-owner granting retroactive reproduction rights barred any infringement claim by remaining co-owners and cured past infringement); and *Lone Wolf McQuade Assocs. v. CBS Inc.*, 961 F. Supp. 587, 597 (S.D.N.Y. 1997) (stating that a retroactive license cures past infringement). *See Davis*, 419 F. Supp. 2d at 499-500. Ultimately, the District Court concluded that, as a result of the written retroactive assignment of rights by Chambliss to Miller, "Davis has no claim for copyright infringement against defendants." *Davis*, 419 F. Supp. 2d at 501. Noting that "one joint owner may always transfer his interest in the work to a third party, including the grant of non-exclusive licenses," *id.* at 500 (citing 1 Melvin B. and David Nimmer, *Nimmer on Copyright* § 6.11 (2005) ("*Nimmer*")), the District Court reasoned that "Davis' [alleged] status as joint owner with Chambliss, who in turn transferred his interests to Miller, bars her from stating a claim for copyright infringement against Miller, or any of the other defendants, [who are] his licensees." *Id.* Davis's timely appeal followed.

**DISCUSSION**

In reviewing a grant of summary judgment, we draw all factual inferences in favor of the non-

8

moving party and review the matter *de novo*. *See, e.g., Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). Summary judgment is only appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See, e.g., Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005). Because the District Court's grant of summary judgment was based on its conclusions about the legal effect of the transfer agreements—a matter that our Court has not yet addressed—resolution of the matter before us will depend on our own analysis of the relevant copyright law. *See Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 775 (2d Cir. 1992).

The question of whether one joint owner of a copyright can retroactively transfer his ownership by a written instrument, and thereby cut off the accrued rights of the other owner to sue for infringement, is an issue of first impression in the courts of appeals. Although the Copyright Act itself is silent on the issue of retroactive transfer or license, we conclude that such retroactive transfers violate basic principles of tort and contract law, and undermine the policies embodied by the Copyright Act.

## A. General Principles of Copyright Law

We revisit some general principles of copyright law in order to place the instant case in its legal context.

Copyright, of course, is a federal grant of a property interest in the production, replication, publication, and distribution of certain classes of "original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), including musical compositions, *Id.* § 102(a)(2).[9] "Copyright in a work protected under [the Copyright Act] thus initially vests in the author or authors of the work." 17 U.S.C. § 201(a). "The authors of a joint work are co[-]owners of copyright in the work," *id.*, and, as described in the House Report accompanying passage of the Copyright Act, are to "be treated generally

_____

[9] The United States Constitution confers on Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art 1, § 8, cl. 8. In the exercise of that power, Congress regulates copyright of creative works through the Copyright Act.

9

as tenants in common, with each co[-]owner having an independent right to use or license the use of a work, subject to a duty of accounting to the other co[-]owners for any profits." H.R. Rep. No. 94-1476, at 121 (1976); *see Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998) ("Joint authorship entitles the co-authors to equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made."). We long ago observed that

> [t]he rights of property which the [co-owner] had were transferable by sale and delivery, and there is no distinction, independent of statute, between [copyrighted property] and property of any other description. The right to sell and transfer personal property is an inseparable incident of the property. An author or proprietor of a literary work or manuscript [or other work protected by the Copyright Act] possesses such a right of sale as fully and to the same extent as does the owner of any other piece of personal property. It is an incident of ownership.

*Maurel v. Smith*, 271 F. 211, 214 (2d Cir. 1921).

Like other forms of property ownership, copyright ownership is a "bundle of discrete rights" regarding the owner's ability to use his property. *See Faulkner v. Nat'l Geographic Enters., Inc.,* 409 F.3d 26, 35 (2d Cir. 2005) ("The Supreme Court stressed that in enacting the 1976 revision [of the Copyright Act], Congress rejected the doctrine of indivisibility, recasting the copyright as a bundle of discrete exclusive rights, 17 U.S.C. § 106 (1994 ed. and Supp. V), each of which may be transferred . . . and owned separately, § 201(d)(2)." (quoting *New York Times v. Tasini*, 533 U.S. 483, 495-96 (2001)) (internal quotation marks omitted)). These rights include "reproduc[ing,]" "prepar[ing] derivative works," "distribut[ing,]" "perform[ing,]" or "display[ing]" a creative work. 17 U.S.C. § 106. Owners may license others to exercise these rights or assign the rights to others. *T.B. Harms,* 339 F.2d at 825. In addition, an owner may sue for infringement those who exploit the creative work without permission or assignment. *See* 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."); *Knickerbocker Toy Co., Inc. v. Azrak-Hamway Int'l., Inc.,* 668 F.2d 699,

10

702 (2d Cir. 1982) (stating that "[t]o prevail on a claim of copyright infringement, a plaintiff must show both ownership of a valid copyright and copying").

The right to prosecute an accrued cause of action for infringement is also an incident of copyright ownership. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991). Moreover, it is a right that may be exercised independently of co-owners; a joint owner is not required to join his other co-owners in an action for infringement. *See* 17 U.S.C. § 501(b) (noting that a court "*may* require" an owner of a copyright to serve notice on a person who is shown "to have or claim an interest in the copyright" and "*may* require the joinder . . . of any person having or claiming an interest in the copyright") (emphasis added); *Edward Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 268, 269 (2d Cir. 1944) ("It was early decided that the holder of the legal title to a copyright might sue without joining others who had an equitable interest in the copyright."); *Copyright.net Music Publ'g LLC v. MP3.com*, 256 F. Supp. 2d 214, 218 (S.D.N.Y. 2003) (holding that copyright infringement plaintiffs were not obligated to join alleged co-owners of compositions at issue).

Early in the twentieth century, we stated in the copyright context the venerable principle of the law of property that, while an owner may convey any of his rights to others permanently or temporarily, he may not convey more than he owns. *Maurel*, 271 F. at 215 ("[W]hen the [co-owners] granted rights to [a music publisher], they could but transmit what they had to part with, and they could not transfer what interest the [other co-owner] had."); *see also Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir. 1981) ("[T]he proprietor of a derivative copyright cannot convey away that which he does not own . . . ."). Accordingly, an owner may give a license to someone to exploit the work in some way, provided he owns that particular copyright interest. 17 U.S.C. § 106. An owner may also convey his interest in prosecuting accrued causes of action for infringement. *ABKCO Music,* 944 F.2d at 980; *see also Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir. 1969) (noting the effectiveness of an assignment of accrued causes of action for copyright infringement).

11

An owner may not, however, convey the interests of his fellow co-owners without their express written consent, even if the transferee has no notice of the non-consenting owners' interest. *See Crosney v. Edward Small Productions*, 52 F. Supp. 559, 561 (S.D.N.Y. 1942) ("One [co-owner of a copyright] cannot bind the interest of another, although he purports to do so, in the absence of assent or ratification upon her part." (internal quotation marks omitted)). A co-owner's ability to grant licenses to third parties unilaterally will therefore depend on the type of licenses granted. There are two general categories of licenses: non-exclusive licenses, which permit licensees to use the copyrighted material and may be granted to multiple licensees; and exclusive licenses, which grant to the licensee the exclusive right—superior even to copyright owners' rights—to use the copyrighted material in a manner as specified by the license agreement.[10] A valid license of either sort immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor. *See Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."); *United States Naval Institute v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright, though it is capable of

---

[10] Under current copyright law, exclusive licenses are recognized as a type of an ownership interest, conveying a particular exclusive right of copyright. *See* 17 U.S.C. § 101 ("'Copyright owner', with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right."). Exclusive licensees may sue without joining the copyright owners, 17 U.S.C. § 501, and exclusive license agreements must be in writing, 17 U.S.C. § 204(a); *see also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982). The differences between an "exclusive" license and an assignment or transfer of copyright ownership interest have diminished to the point that the terms are nearly synonymous. *See* 17 U.S.C. § 101 ("A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance . . . of a copyright or any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."). However, although it is possible to share ownership of a copyright interest as co-owners, an exclusive licensee of an interest is the only one who may exercise that right. "Each author's rights in a joint work are non-exclusive, whereas a sole author retains exclusive rights in his or her own work." *Thomas,* 147 F.3d at 205 (internal citations omitted). Therefore, in order to convey exclusive rights, all co-owners must agree to convey their shares of the same right.

Under the earlier version of the copyright statute, the Copyright Act of 1909, copyright ownership was generally considered indivisible; thus, the individual rights comprising the bundle of copyright property rights could not be separately assigned, and exclusive licenses granted more limited rights—for example, exclusive licensees had to join copyright owners in suits for infringement. Apparently, because exclusive licenses were not transfers of ownership, oral agreements granting exclusive licenses were permissible. *See* 3 *Nimmer* §10.01[C].

12

breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it."); *see also McKay v. Columbia Broad. Sys. Inc.,* 324 F.2d 762, 763 (2d Cir. 1963) ("[A] license from a co-holder of a copyright immunizes the licensee from liability to the other co-holder for copyright infringement.").

A co-owner may grant a *non-exclusive* license to use the work unilaterally, because his co-owners may also use the work or grant similar licenses to other users and because the non-exclusive license presumptively does not diminish the value of the copyright to the co-owners. *See Meredith v. Smith*, 145 F.2d 620, 621 (9th Cir. 1944) (noting that a "co-owner had the right to give permission" for non-exclusive use of a copyrighted work); 1 *Nimmer* § 6.10[A], 6-34. In any event, a co-owner who grants a non-exclusive license is accountable to his co-owner for income gained by the grant of the license. *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 223 F.2d 252, 254 (2d Cir. 1955). However, a licensee is not liable to a non-licensing co-owner for use authorized by the license, because the licensee's rights rest on the license conveyed by the licensing co-owner. *See McKay* 324 F.2d at 763. Likewise, a licensee need not pay any royalties or other consideration to the co-owners who are not parties to the license agreement. *See Piantadosi v. Loew's, Inc.*, 137 F.2d 534, 537 (9th Cir. 1943) (holding that a third party granted a non-exclusive copyright license by one co-owner had no duty to the other co-owner); 1 *Nimmer* § 6.12(c)(3). A non-exclusive license conveys no ownership interest, and the holder of a nonexclusive license may not sue others for infringement. *See Eden Toys*, 697 F.2d at 32 ("The Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights."). An exclusive license, on the other hand, conveys an ownership interest. *See Campbell v. Trustees of Stanford University*, 817 F.2d 499, 504 (9th Cir. 1987). Accordingly an exclusive licensee may sue others for infringement, including the licensor if the licensor infringes on the exclusive right he granted the licensee. *See U.S. Naval Institute*, 936 F.2d at 695 (citing 3 *Nimmer* § 12.02). Because no one other than

13

the exclusive licensee may exercise the right specified by the exclusive license agreement, the interests of the other co-owners to use or grant non-exclusive licenses to the work are necessarily impaired. An exclusive license thus destroys the value of a copyright to the copyright owners, to the extent that the licensed rights cannot be used or exploited by the copyright owners. Unlike a transfer of one co-owner's copyright interest to another person, which conveys only the co-owner's share of that interest, an exclusive license grants all co-owners' shares of a particular copyright interest to the exclusive licensee. Accordingly, a co-owner cannot unilaterally grant an exclusive license. *See Maurel*, 271 F. at 216 ("Where two or more persons have a common interest in a property, equity will not allow one to appropriate it exclusively to himself, or to impair its worth as to others."); 1 *Nimmer* § 6.11 (noting prohibition on one co-owner granting an exclusive license without consent of other co-owners).

## B. Retroactive Licenses and Transfers Are Invalid

In this case, we deal with the question of whether a copyright co-owner—who, according to the legislative history of the Copyright Act, we are to treat as a tenant in common, *see ante* page 10—can convey his copyright interest to a third party retroactively, thereby defeating a claim of infringement asserted against that third party by another co-owner. In *Eden Toys*, we held that a later writing could memorialize or confirm an earlier oral agreement. *Eden Toys*, 697 F.2d at 36. The District Court in the instant case concluded that "a reasonable jury could find an oral agreement never existed between Chambliss and Miller." *Davis*, 419 F. Supp. 2d at 498. Still, the District Court agreed with defendants that "the written agreements would nonetheless be valid to defeat Davis' claims." *Id.* at 499. Relying on several district court decisions holding that retroactive licenses are permissible and enforceable, *see ante* pages 8-9, it concluded that the written agreements between Chambliss and Miller were sufficient to defeat Davis's claims.

We conclude that the district court decisions relied upon by the District Court are distinguishable from the instant case insofar as they involved retroactive licenses granted pursuant to

14

negotiated settlements of accrued infringement claims. *See, e.g., Country Road Music*, 279 F. Supp. 2d at 328 (agreeing with defendant that "a settlement agreement between [defendant and co-owner] granted defendant retroactive reproduction rights that bar any infringement claim by plaintiffs [co-owners]"); *SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1059 (D.N.J. 1989) ("The [settlement] agreement contemplated a retroactive written license for the use of the musical composition . . . ."); *Lone Wolf McQuade*, 961 F. Supp. at 590 ("In a settlement agreement dated December 9, 1996, [co-owner] granted [defendant] a retroactive license from January 1, 1990."). Indeed, to the extent that the district courts deciding these cases state the rationale of their legal conclusions, they uphold the agreements as private contracts between two parties without examining the implications for other holders of the copyright, other than to say in a conclusory fashion that these agreements will have the effect of barring infringement claims by third-parties, including co-owners. *See, e.g., Country Road Music*, 279 F. Supp. 2d at 329 ("[A] license from a co-holder of a copyright immunizes the licencee from liability to the other co-holder for copyright infringement.") (quoting *McKay*, 324 F.2d at 763 ).

We believe that reliance on cases involving settlements is misplaced. Licenses and assignments function differently from settlements and releases, and the use of the term "retroactive license" for "settlement" or "release" by the parties causes unnecessary confusion and potentially creates legal mischief. Settlements are generally retrospective and exclusively between the parties to the settlement—the unauthorized user and the owner; and, absent clear language to the contrary, they are not licenses for future use. The Seventh Circuit has aptly observed that "[a] settlement agreement [is] nothing more than a promise by [one party] to pay liquidated damages for past infringements in return for a dismissal of the infringement suit. [The party] erroneously equates a settlement for past infringement with a license for prospective use . . . ." *Ransburg Electro-coating Corp. v. Spiller & Spiller, Inc.*, 489 F.2d 974, 977 (7th Cir. 1973); *see also Birdsell v. Shaliol*, 112 U.S. 485, 487 (1884) ("[A]n infringer does not, by paying damages for making and using a machine in infringement of a patent, acquire any right himself to the future use of the machine. On the contrary, he may, in addition to the payment of

damages for past infringement, be restrained . . . from further use . . . ."); *United States v. Youngstown Sheet & Tube Co.*, 171 F.2d 103, 111 (6th Cir. 1948) ("A release for wrongs done in the past is not the equivalent of a license to do rightfully the same thing in the future.") (quoting *Raytheon Mfg. Co. v. Radio Corp. of America*, 190 N.E. 1, 5 (Mass. 1934)). A settlement agreement between an injured owner and an injuring non-owner recognizes the unauthorized use while providing a remedy to the injured owner that is acceptable to all parties to the agreement.

A settlement agreement can only waive or extinguish claims held by a settling owner; it can have no effect on co-owners who are not parties to the settlement agreement. It is a venerable principle of New York co-tenancy law, for example, that "[o]ne tenant in common can settle for or release his interest in . . . personal property, but he cannot settle for or release the interest of his co-tenants. If one tenant in common should settle for his portion of the damages before action, the other may sue without joining him." *Jackson v. Moore*, 87 N.Y.S. 1101, 1103 (App. Div. 3d Dep't 1904); *see also Wagman v. Carmel,* 601 F. Supp. 1012, 1015 (E.D. Pa. 1985) ("Ordinarily, although a tenant in common may freely sell or otherwise dispose of his own interest in jointly held property, he may not act so as to prejudice the rights of his co-tenants. For example, a tenant in common may not unilaterally bind his co-tenants to an agreement concerning the use, control, or title to the joint property."). "[S]ettlement agreements are 'not to be used as a device by which A and B, the parties to the decree, can (just because a judge is willing to give the parties' deal a judicial imprimatur) take away the legal rights of C, a nonparty.'" *Bacon v. City of Richmond*, 475 F.3d 633, 643 (4th Cir. 2007) (quoting *United States v. Bd. of Educ. of Chicago*, 11 F.3d 668, 673 (7th Cir. 1993)).

Licenses and assignments, however, are prospective; they permit use by a non-owner who would not otherwise have a right to use the property. "In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent." *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930). A retroactive license or assignment purports to

16

authorize a past use that was originally unauthorized.  Unlike a settlement, which recognizes an unauthorized use but waives a settling owner's accrued claims of liability, a retroactive license or assignment would—if given legal effect—erase the unauthorized use from history with the result that the nonparty co-owner's right to sue for infringement, which accrues when the infringement first occurs, is extinguished.  This is the effect of the District Court's decision in this case.

The co-owner's right that would be extinguished by a rule permitting retroactive licenses or assignments—the right to sue for infringement—is a valuable one; indeed, it is one of the most valuable "sticks" of the "bundle of rights" of copyright.  *See Silvers v. Sony Pictures Entm't, Inc.,* 402 F.3d 881, 890 n.1 (9th Cir. 2005) ("[T]o receive maximum value for the impaired copyright, one must also convey the right to recover the value of the impairment by instituting a copyright action.").  Accordingly, we must examine carefully whether retroactive licenses and assignments that extinguish a co-owner's accrued right to sue are consistent with the general principles of tort[11] and contract law that underlie the accrual and settlement of infringement claims.

As we have observed, "[u]nder general principles of [tort] law, a cause of action accrues when conduct that invades the rights of another has caused injury.  When the injury occurs, the injured party has the right to bring suit for all of the damages, past, present and future, caused by the defendant's acts." *Leonhard v. United States,* 633 F.2d 599, 613 (2d Cir. 1980) (citing Restatement (Second) of Torts §§ 899, 910 (1977)).  A "retroactive" assignment or license that extinguishes the accrued infringement claims of a non-consenting co-owner by traveling back in time to "undo" an unlawful infringement destroys the co-owner's valuable *and vested* right to enforce her claim.

A retroactive license or assignment that purports to eliminate the accrued causes of action for infringement held by a co-owner who is not party to the license or agreement also violates the

---

[11]  Infringement has long been recognized as a tort.  *See Ted Browne Music Co. v. Fowler*, 290 F. 751, 754 (2d Cir. 1923) ("Courts have long recognized that infringement of a copyright is a tort."); *see also Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552, 554 (2d Cir. 1972) ("Copyright infringement is in the nature of a tort, for which all who participate in the infringement are jointly and severally liable.").

17

fundamental principle of contract law prohibiting the parties to a contract from binding nonparties. *See, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."). Moreover, a co-owner who purports to convey not only his right to prosecute past infringements but also his co-owners' right to prosecute past infringements violates the basic rule that an owner cannot convey more than he owns. *See Roy Export Co. Establishment v. Columbia Broad. Sys., Inc.*, 503 F. Supp. 1137, 1153 (S.D.N.Y. 1980) ("[I]t is axiomatic that no one can convey more than his own interest in a work."). We have no doubt that Chambliss can release his own accrued claims of copyright infringement against Miller and his fellow defendants, either orally or in writing. But we know of no authority to sanction his attempt to release any rights Davis has against Miller, for they are not Chambliss's to release.

None of what we say above should be read as preventing an owner and an infringer from settling infringement claims among themselves. *See ABKCO Music, Inc. v. Harrissongs Music, Ltd.*, 722 F.2d 988, 997 (2d Cir. 1983) (noting in a copyright infringement case, that "courts favor the policy of encouraging voluntary settlement of disputes"); *see also In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 203 (2d Cir. 2006) ("The general policy of the law is to favor the settlement of litigation, and the policy extends to the settlement of patent infringement suits." (quoting *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 991 (N.D. Ill. 2003) (Posner, J., sitting by designation))). An owner who wishes to release unilaterally his own accrued claims may do so using whatever language he chooses—including by calling the negotiated settlement the proverbial "banana"—but such an agreement cannot have the effect of eviscerating a co-owner's claims based on past copyright infringement, nor can it settle accrued claims held by co-owners who are not themselves parties to the agreement. Accordingly, we hold that a license or assignment in copyright can only act prospectively.

We find support for this holding in the law of patents. Although patent and copyright law function somewhat differently, courts considering one have historically looked to the other for guidance where precedent is lacking. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439

18

(1984) (referring to the "historic kinship between patent law and copyright law" when looking at patent law to understand vicarious liability in copyright). Our holding in this case is consistent with the law of patents. *See Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997) ("[T]he grant of a license by one co-owner cannot deprive the other co-owner of the right to sue for accrued damages for past infringement. That would require a release, not a license, and the rights of a patent co-owner, absent agreement to the contrary, do not extend to granting a release that would defeat an action by other co-owners to recover damages for past infringement."). The prospective nature of licenses has long been recognized in the law of patents. *See, e.g.*, *Waterloo Furniture Components, Ltd. v. Haworth, Inc.,* 467 F.3d 641, 647 (7th Cir. 2006) ("Courts have recognized the prospective quality of a patent license, which allows another party to use the patentee's property in the future without fear of suit."); s*ee also Wang Labs., Inc. v. Oki Elec. Indus. Co.*, 15 F. Supp. 2d 166, 172 (D. Mass. 1998) (noting that "there is authority to the effect that the concepts of both royalty and license are necessarily prospective, rendering a 'retroactive royalty agreement' a legal nullity"). Licenses in patent and copyright function similarly, *see Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984), and thus it is appropriate to consider copyright licensing, like patent licensing, prospective in nature. We see no reason why this principle should not also apply to the assignments of the type at issue here.

There is little from a policy perspective to recommend a rule that allows retroactive licenses or assignments, and there are two strong reasons disfavoring them—(1) the need for predictability and certainty and (2) discouragement of infringement. A rule permitting retroactive assignments and transfers would inject uncertainty and unpredictability into copyright ownership, contrary to the intent of Congress in enacting the Copyright Act of 1976. *See, e.g.*, *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) (declaring that "Congress' paramount goal in revising the 1976 Act [was] enhancing predictability and certainty of copyright ownership"); *In re Cybernetics Servs. Inc.,* 252 F.3d 1039, 1056 (9th Cir. 2001) ("[F]ederal copyright laws ensure predictability and certainty of copyright ownership . . . ." (quoting *In re Peregrine Entm't, Ltd.*, 116 B.R. 194, 199 (C.D. Cal. 1990)). It would also

damage, if not extinguish, the "principal purpose" of the Copyright Act, which is "to encourage the origination of creative works by attaching enforceable property rights to them." *Diamond v. Am-Law Publ'g Corp.*, 745 F.2d 142, 147 (2d Cir. 1984); *see also Veeck v. S. Bldg. Code Congress Int'l Inc.*, 241 F.3d 398, 402 (5th Cir. 2001) ("The core purpose of copyright law is 'to secure a fair return for an author's creative labor' and thereby 'to stimulate artistic creativity for the general public good.'" (quoting *Twentieth Century Music Group v. Aiken*, 422 U.S. 151, 156 (1975)). If retroactive transfers and licenses were permissible, one could never reliably and definitively determine if and when an infringement occurred, because an infringement could be "undone" by the very sort of maneuver attempted by defendants in this case. *See Venegas-Hernandez v. Asociación de Compositores y Editores de Música Latinoamericana*, 424 F.3d 50, 60 (1st Cir. 2005) ("Fitting agency concepts like 'retroactive authorization' into copyright law provides plenty of room for debate; obviously a license in 1998 did not 'cause' a 1993 infringement.").[12] Similarly, one could never know who the pool of authorized users or licensors of a copyright would be at any given time, because a retroactive transfer could always turn an infringer into a potential user or licensor, who would then have the ability to grant his own retroactive licenses or retransfer his new (retroactive) interest retroactively.

This case demonstrates why permitting such an indeterminate legal regime could create substantial mischief. Construing the facts in a light most favorable to Davis, as we are required to do in the case of a summary judgment, Miller had no right to use or license the disputed compositions at the time they were used on the Album or at the time he licensed them to the third-party defendants. The third-party defendants are, in turn, potentially liable for infringement to Davis because they never obtained a legitimate right to use the disputed compositions.[13] If Chambliss were permitted to assign

---

[12] *Venegas-Hernandez* had no occasion to address the retroactivity issue—what it described as a "recherché area of copyright law," *id.*— because the party seeking to benefit from a retroactive license in that case did not adequately pursue it.

[13] Miller could be exposed to liability under a theory of contributory infringement or for unauthorized licensing of the disputed compositions even if he himself had not used the disputed compositions without authorization. While an owner of a copyright may assign an expectancy of a renewal interest in that copyright validly, *see Fred Fisher*

his interest in the disputed compositions retroactively, Davis's infringement claims would fail not only against Miller (because Miller would be "retroactively authorized" to use the compositions as a co-owner), but also against the third-party defendants, whose illegitimate licenses would retroactively become legitimate because Miller (by operation of the legal fiction of retroactivity) would now have been authorized as a co-owner to grant third parties the right to use the disputed compositions. Thus, Chambliss's alleged retroactive assignment to Miller of the disputed compositions, for consideration of one dollar each, would have the effect of unraveling valuable accrued infringement claims against not only the retroactive assignee (Miller) but also his licensees.[14]

The second policy reason disfavoring retroactive copyright transfers and licenses that extinguish the right of other co-owners is that such retroactive activity lowers the cost of infringement to infringers, thus making infringement more attractive. An infringer could "buy" his way out of an infringement suit, in which an injured owner may seek enhanced statutory damages and costs, *see* 17 U.S.C. § 504, by paying a single co-owner for a license or assigned copyright interest. A retroactive license or assignment that can be obtained from a co-owner not bringing suit, or one willing to settle

---

*Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 656-57 (1943) (holding that an assignment of renewal rights in advance of the owner securing the right to renew was valid), one who grants a license without holding any interest in the copyright at the time the license is granted is differently situated because he purports to exercise a right he does not—and cannot—possess without the consent of the copyright owner. Thus, the unauthorized licensor may be liable for infringement committed by his unauthorized licencees under a theory of contributory infringement as "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (footnote omitted); *see also Sony Corp.*, 464 U.S. at 435 (recognizing theory of contributory infringement); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (discussing theory of contributory infringement). The unauthorized licensor also arguably "violates . . . the exclusive rights of the copyright owner," 17 U.S.C. § 501(a), "to authorize" who may use the copyright, 17 U.S.C. § 106. *But cf. Venegas-Hernandez*, 424 F.3d at 57-59 (holding that an unauthorized licensor is not liable for copyright infringement absent evidence that the unauthorized licensees actually infringed the copyright).

In any event, Miller would have exceeded his authority as a co-owner to the extent he granted a third-party an exclusive license to the disputed compositions, because he did not join Davis to the licensing agreement. *See* 17 U.S.C. § 201(d)(2); 1 *Nimmer* § 6.11 (noting prohibition on one co-owner granting an exclusive license without consent of co-owners).

[14] We note that were we to permit retroactive transfers of copyright interests in these circumstances, infringers who obtained a retroactive transfer of a copyright interest could not only grant retroactive licenses but also sue *other* past infringers of the copyright. These retroactive co-owners could then issue retroactive licenses to these other past infringers, thwarting yet other potential infringement suits by a non-licencing co-owner.

21

for a lower price than the co-owner bringing the action, is likely to cost much less than the value of the copyright interest including the cost of litigation. The result is that infringement is encouraged and rewarded. This economic incentive to infringe runs directly counter to the intent of Congress in passing 17 U.S.C. § 504—namely to "compensate the copyright owner for losses from the infringement, and . . . to prevent the infringer from unfairly benefitting from a wrongful act." *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 470 (2d Cir. 1985) (quoting H.R. Rep. No. 94-1476, at 161).[15]

For the reasons stated above, we conclude that the written transfer agreements, through which Chambliss allegedly transferred his interests in the disputed compositions to Miller, cannot extinguish Davis's accrued infringement claims against any of the defendants. On remand, the District Court shall adjudicate Davis's infringement claims without giving effect to the purported retroactive assignment of Chambliss's interest in the disputed compositions.[16]

We now turn to address defendants' alternative argument regarding ratification. Miller argued before the District Court that Chambliss transferred his interests in the disputed compositions (and potentially other compositions) to Miller in 1998 or early 1999, in an alleged oral agreement, before the alleged infringement occurred. Miller and his co-defendants acknowledged that the Copyright Act

---

[15] If the retroactive agreement were given effect, the possibility that Davis could seek an accounting from Miller, *see Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 571 (2d Cir. 1955) ("*Shapiro I*"), *modified*, 223 F.2d 252, 254 (2d Cir. 1955) ("*Shapiro II*") ("[E]ach holder of the . . . copyright should account to the other for his exploitation thereof[]—not as an infringer but as a trustee."), would be an inadequate substitute for Davis's accrued infringement claims. If Davis retained her accrued infringement claims, in order to obtain damages and profits from defendants she would only need to prove defendants' gross revenues from the disputed compositions; the burden would then shift to defendants to prove that their profits were less than their gross revenues. *See* 17 U.S.C. § 504(b) ("[T]he copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."). Davis would also be able to elect statutory damages "at any time before final judgment is rendered." *Id.* § 504(c)(1). Were Davis to only have an accounting remedy against Miller, however, she would be unable to elect statutory damages; she would bear the full burden of proof in demonstrating Miller's profits from the licensing of the disputed compositions; and she would only be entitled to an "equitable share" of Miller's profits, *Shapiro I*, 221 F.2d at 571, rather than all of the profits. Moreover, if Davis were limited to an accounting remedy against Miller, she would be unable to recoup either profits obtained by the third-party defendants as a result of their unauthorized use of the disputed compositions, or her own damages as a result of that unauthorized use.

[16] We express no opinion on whether the transfer agreements should be given prospective effect, or—if they are given prospective effect—whether the transfer agreements would limit Davis's remedies against the third-party defendants.

22

requires all transfer agreements—including assignments—to be in writing, *see* 17 U.S.C. § 204(a), but argued that the transfer agreements ratified the earlier oral agreement. *See Davis*, 419 F. Supp. 2d at 497-98. Because the District Court found that "a genuine issue exists as to whether Chambliss ever orally transferred his rights in the [disputed c]ompositions to Miller," the District Court did not "consider whether the [transfer a]greements [were] sufficient to satisfy the writing requirement [of the Copyright Act] as a written ratification of a prior oral transfer." *Id.* at 498.

We conclude that, even if an oral agreement assigning Chambliss's copyright in the disputed compositions to Miller was reached in 1998 or 1999, the oral agreement cannot be "ratified" retroactively by the 2004 transfer agreements to defeat Davis's accrued infringement claims. This is so for the same reasons we cannot give the transfer agreements themselves retroactive effect. If there was no written agreement between Miller and Chambliss documenting the alleged assignment at the time the disputed compositions were used by defendants, defendants had no legal right to use the disputed compositions,[17] and Davis's right to sue for infringement accrued. Chambliss and Miller could not extinguish Davis's accrued infringement claims by "ratifying" an earlier oral agreement that had no legal effect at the time it was made, because doing so would require us to employ a legal fiction—treating the transfer agreements as if they were written in 1998 or 1999, rather than 2004—to obtain a counterintuitive and inequitable result.

Our opinion in *Eden Toys* is readily distinguishable from the facts of the instant case. In *Eden Toys,* we held that a third-party infringer could not assert the invalidity of an alleged 1975 oral agreement for an exclusive license, which was allegedly memorialized in a 1980 writing, to defeat an infringement claim brought by the exclusive licensee. *See Eden Toys*, 697 F.2d at 36-37. We first noted that the alleged oral agreement was valid at the time it was made, *see id.* at 36 (noting that "[u]nder the pre-1978 copyright law, exclusive licenses could be granted orally or by conduct"). We then held that,

---

[17] The following discussion assumes that Davis proves at trial that she holds copyright in the disputed compositions, and that the Album compositions infringed her copyright in the disputed compositions.

23

because the purpose of the writing requirement in the Copyright Act of 1976 was "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses . . . [where] the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee." *Id.*

In this case, however, the "third party" is a copyright holder who *does* have a dispute with the alleged licensee or transferee and who would stand to lose her accrued rights to sue for infringement if an allegedly fraudulent oral agreement were given legal effect. Thus it would be anomalous *not* to let Davis invoke § 204(a) in support of her infringement claims. Even if a third-party infringer cannot, under *Eden Toys*, contest the validity of an oral transfer agreement under pre-1978 copyright law that is later confirmed in writing, *see Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1429 (9th Cir. 1996) (stating that "[t]he logic of *Eden Toys* is particularly compelling in this case" and holding that a third-party infringer could not assert as a defense to an infringement claim the alleged invalidity of an oral transfer agreement that was later confirmed in writing); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 592 (7th Cir. 2003) (holding that a third-party infringer lacked "standing" to contest the validity of an oral assignment that was later confirmed in writing), we do not read *Eden Toys* to foreclose a presumed copyright holder (Davis) from using the invalidity of an alleged oral transfer agreement to *defeat an infringer*'s effort to avoid liability for accrued infringement claims.[18]

---

[18] Because we hold that a written confirmation of an earlier oral transfer agreement cannot extinguish a copyright owner's accrued infringement claims, we need not decide whether there ought to be, as a general rule, any other limitations on permitting oral transfer agreements to be validated at a later date by a writing that complies with the requirements of § 204(a). *Cf. Konigsberg Int'l Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994) (holding that copyright owner's letter, written "three and a half years after the alleged oral agreement, a year and a half after its alleged term would have expired and 6 months into a contentious lawsuit," was "not the type of writing contemplated by section 204 as sufficient to effect a transfer of the copyright," because it was not "a product of the parties' negotiations" and "came far too late to provide any reference point for the parties' license disputes"); *Magnuson*, 85 F.3d at 1429 n.1 (stating that "the problem with the writing in [*Konigsberg*] was not so much that it was not contemporaneous with the agreement but that it was 'not the *type* of writing contemplated by section 204'" (quoting *Konigsberg*, 16 F.3d at 357)).

We also need not decide whether Chambliss's alleged oral agreement with Miller might be interpreted to have granted Miller a valid nonexclusive license to use the disputed compositions. *See Graham*, 144 F.3d at 235 ("nonexclusive licences . . . may be granted orally" (quoting 3 *Nimmer* § 10.03[A][7])). We note that while a nonexclusive license from Chambliss to Miller might immunize Miller from Davis's claims of infringement against him for use of the disputed compositions, Miller would not, as a nonexclusive licensee, have been be able to grant licenses of any kind to his

24

**CONCLUSION**

Inasmuch as the alleged retroactive written agreements purporting to transfer Chambliss's copyright interests to Miller could not also transfer Davis's copyright interests, Davis's accrued causes of action for infringement were not affected by the agreement between Chambliss and Miller. Accordingly, the District Court erred in granting summary judgment to defendants. The District Court's order of November 22, 2005 is hereby vacated and the cause is remanded for proceedings consistent with this opinion.

---

codefendants. Accordingly, even if Davis in such circumstances had no claim against Miller, she would continue to have claims against the other defendants.